**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **L.N.K. INTERNATIONAL, INC.,** | |
| Plaintiff, | Civil Action No.: 2:22-cv-05184 |
| – against – | |
| **CONTINENTAL CASUALTY COMPANY,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff L.N.K. International, Inc. ("LNK"), by and through its undersigned counsel, as and for its Complaint against Defendant, Continental Casualty Company ("CNA"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This is an insurance coverage action that arises out of CNA's refusal and failure to provide defense and indemnity coverage for the costs that LNK has or will incur with respect to no less than *twenty-six* covered claims initiated within the last year.

2.      LNK's business involves distributing store-branded, over-the-counter ("OTC") medications to multiple well-known pharmacy retailers that, in turn, sell these products - such as cough syrup and acetaminophen tablets – to consumers.   Though these medications bear the names and logos of entities like CVS, Rite Aid, and Walgreens, such entities rely on LNK for the proper manufacture and packaging of such products.  As part of LNK's ongoing business relationships with pharmacy retailers, and due to those retailers' reliance on LNK's work, LNK agrees to indemnify the retailers for claims and liability arising out of LNK's products.

3.      Because of LNK's unique business model, including numerous indemnification obligations, LNK paid substantial premiums to CNA to purchase an insurance policy (the "Policy") that, by its terms, is intended to provide, among other things, general and professional liability coverage for claims against either LNK or vendors of LNK's products.

4.      Over the course of the year, LNK and/or retailers of LNK's products have been sued in twenty-six separate litigations brought by purchasers of LNK's products and alleging damages related to or arising out of such products.

5.      Though these lawsuits and indemnity claims are precisely the types of claims that the Policy is intended to cover, CNA has denied coverage for 11 claims and, upon information and belief, intends to deny coverage for the remaining 15.  To justify its denials, CNA relies on numerous inapplicable Policy provisions, including Policy language that has been deleted by endorsement.

6.      In several of these lawsuits, though LNK has not been sued directly, the retailers that were sued tendered to LNK for defense and indemnity pursuant to the terms of their respective indemnity agreements.  Rather than defending its insured against those claims by the retailers and seeking to ensure that LNK is not named as a defendant in those underlying actions, contrary to the policy language, CNA purports to require that LNK become a named defendant before defense coverage is available.

7.       CNA's refusal to defend and indemnify LNK constitutes a breach of CNA's obligations under the Policy and violates CNA's duty of good faith and fair dealing.  LNK therefore brings this action seeking coverage under the Policy for those defense and indemnity costs that LNK incurs with respect to the underlying actions, along with damages for CNA's

breach of contract and CNA's bad faith refusal to meet its defense obligations under the terms of the Policy.

## PARTIES

8.      Plaintiff LNK is a Delaware corporation with a principal place of business in Hauppauge, New York.

9.      Upon information and belief, Defendant CNA is a corporation organized under the laws of Illinois, maintains its principal place of business in Chicago, Illinois, and is an insurance company that is licensed to do business in the state of New York, among other places. Upon information and belief, Defendant CNA has written insurance policies covering risks for New York citizens and/or is otherwise transacting business in the state of New York.

## JURISDICTION & VENUE

10.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties to the action and because the amount in controversy exceeds $150,000.00, exclusive of interest and costs.

11.      The Court has specific personal jurisdiction over this action because CNA purposefully availed itself of the laws of New York through the issuance of the Policy at issue to the LNK, a corporation with a principal place of business in Hauppauge, New York.

12.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because the substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### I.     LNK'S BUSINESS

#### A.     LNK Manufactures, Packages, and Sells Generic, Store-Branded OTC Pharmaceuticals to Nationwide Retailers

13.     LNK is one of the largest manufacturers and suppliers of solid and liquid dose, OTC pharmaceuticals in the U.S.  As part of its business, LNK also creates and manufactures the packaging and labels for certain generic, store-branded versions of FDA-approved OTC drugs.

14.     LNK's clients include multiple nationwide retail chains, including the following entities and their affiliates and subsidiaries (collectively, the "Retailers"):

a.     Albertsons Companies, Inc.;

b.     CVS Health Corporation;

c.     CVS Pharmacy, Inc.;

d.     Meijer, Inc.;

e.     Rite Aid Corporation

f.     Safeway, Inc.;

g.     SuperValu, Inc.;

h.     Walgreens Boots Alliance, Inc.;

i.     Walgreen Co.;

j.     Walmart, Inc.; and

k.     Walmart Stores, Inc.

15.     Each of the Retailers is a vendor of LNK's merchandise and contracts with, or has contracted with, LNK, for both the supply of certain of that Retailer's store-branded OTC drugs and for the design and manufacture of the packing for those drugs (collectively, the "LNK Products").

16.     Retailers rely on LNK to review and interpret the FDA's "OTC monograph" applicable to each respective drug and to create packaging and labels that satisfy the conditions – including the labeling requirements – set forth therein.

17.     Because a drug's OTC monograph does not provide the specific label that must be used with respect to a given drug, LNK must use its professional judgment to create packaging that complies with FDA regulations.

**B.      Retailers Contract to Purchase LNK Products by Submitting Purchase Orders that LNK Fulfills Pursuant to the Terms of Supplier Agreements**

18.     Retailers contract for the purchase of a specific type and quantity of LNK Products via the execution of individual purchase orders (the "Purchase Orders") submitted to and fulfilled by LNK.

19.     LNK maintains supply agreements with each Retailer (collectively, the "Supplier Agreements") that establish the terms and conditions pursuant to which LNK will supply that Retailer with LNK Products once the Retailer submits a Purchase Order to LNK.

20.     The Supplier Agreements impose no obligation on the Retailers to make any purchase, nor do they require LNK to manufacture or ship drugs to the Retailers.

21.     Subject to their terms and conditions, the Supplier Agreements obligate LNK to defend and indemnify a Retailer for liability arising out of LNK Products.

**i.      The Albertsons Supplier Agreement**

22.     The March 6, 2008 Continuing Commodity Guaranty and Indemnity Agreement (the "Albertsons Supplier Agreement"), attached hereto as **Exhibit 1**, is an agreement between LNK on one hand, and "Safeway, Inc. or any entity which is now or hereafter becomes [Safeway Inc.'s] direct or indirect affiliate or subsidiary (collectively 'Buyer')" on the other.

23.      Upon information and belief, Safeway, Inc. ("Safeway") is a subsidiary of Albertsons Companies, LLC and/or an affiliate of Albertsons Companies, Inc ("Albertsons").

24.      The Albertsons Supplier Agreement is not a contract for the purchase or sale of LNK Products.  It neither obligates Safeway or Albertsons to purchase LNK Products, nor obligates LNK to sell LNK Products to Safeway or Albertsons, but rather specifies certain terms and conditions pursuant to which LNK is to provide LNK Products should a Buyer choose to purchase LNK Products.

25.      The Albertsons Supplier Agreement specifies that a Buyer may purchase LNK Products by placing "purchase orders" via "Electronic Data Interchange (EDI), by facsimile, or by other written means."

26.      Pursuant to the Albertsons Supplier Agreement, LNK represented, warranted and guaranteed that, as of the time of delivery of LNK Products, such LNK Products "[shall] not be . . . misbranded . . . [and shall] be in compliance with all . . . applicable federal, state, and local laws and regulations . . . [and shall] be merchantable and fit for their intended purpose and pass without objection in trade."

27.       Under the Albertsons Supplier Agreement, LNK is also obligated to "indemnify, hold harmless, and, if requested by Buyer to defend Buyer from and against any and all claims, demands, lawsuits, actions, proceedings . . . brought against . . . Buyer . . . arising out of or pertaining to any breach or alleged breach by [LNK] of  . . . [LNK's representation, warranty, and guarantee]."

28.      Per the terms of the Albertsons Supplier Agreement, LNK's indemnification obligation extends to both Safeway and Safeway's affiliates.

### ii. The CVS Supplier Agreement

29.    The February 2, 2018 Private Label Supply Agreement (the "CVS Supplier Agreement"), attached hereto as **Exhibit 2**, is an agreement between LNK and CVS Pharmacy, Inc. ("CVS") that specifies the terms and conditions pursuant to which LNK is to provide LNK Products to CVS should CVS choose to purchase them.

30.    The CVS Supplier Agreement is not a contract for the purchase or sale of LNK Products, but explicitly provides that CVS may contract to purchase LNK Products by submitting "Purchase orders" to LNK, and that CVS "is not obligated or committed to purchase any quantities [of LNK Products] except as expressly ordered by [CVS]."

31.    The CVS Supplier Agreement requires LNK to defend and indemnify CVS for liability arising out of LNK Products and provides, in relevant part, that LNK must:

> . . . defend, indemnify and hold harmless [CVS] and its affiliates. . .
> from and against any and all claims . . . brought by a third party . . .
> in connection with [CVS's] marketing, distribution or sale of [LNK]
> Products and arising directly or indirectly out of . . . any defect,
> alleged or real, in any [LNK Product]. . .; (or) any claims made or
> approved by [LNK] and relied on by [CVS] with respect to the
> [LNK] Product (i.e. health claims); or. . . any violation of any law
> or regulation by [LNK] in the manufacturing, labeling, packaging,
> compounding, production, marketing or sale of [LNK] Products.

32.    Per the terms of the CVS Supplier Agreement, LNK's indemnification obligation extends to CVS and CVS's affiliates.

### iii. The Meijer Supplier Agreement

33.    The October 7, 2019 Master Terms and Conditions (the "Meijer Supplier Agreement"), attached hereto as **Exhibit 3**, is an agreement between LNK and Meijer, Inc. ("Meijer") that specifies the terms and conditions pursuant to which LNK is to provide Meijer with LNK Products should Meijer choose to purchase them.

34.     The Meijer Supplier Agreement is not a contract for the purchase or sale of LNK Products and, by its explicit terms, "do[es] not commit Meijer to order, purchase or accept any [LNK Products]" and requires instead that contracts for the purchase of LNK Products to be executed by separate "[Purchase] Orders."

35.     The Meijer Supplier Agreement requires LNK to defend and indemnify Meijer for liability arising out of LNK Products and provides, in relevant part, that LNK must:

> . . . indemnify, defend, and hold harmless Meijer . . . against any and all claims, demands, actions, proceedings, lawsuits, . . . liabilities, losses, damages, judgments, settlements, costs, and expenses (including reasonable actual attorneys' fees) . . . incurred by Meijer . . . allegedly arising out of . . . any defect or claim of defect in any [LNK Products] sold to Meijer . . . .

36.     Per the terms of the Meijer Supplier Agreement, LNK's indemnification obligation extends to both Meijer and Meijer's affiliates.

**iv.     The Rite Aid Supplier Agreement**

37.     The August 11, 2016 Defense and Indemnity Agreement (the "Rite Aid Supplier Agreement"), attached hereto as **Exhibit 4**, requires LNK to defend and indemnify Rite Aid for liability arising out of LNK Products and provides, in relevant part, that LNK must:

> defend, indemnify and hold harmless Rite Aid . . . from and against any and all damages, demands, claims, suits, actions, costs of investigations, assessments, judgments, fines, losses, liabilities, [and] other costs and fees . . . asserted against . . . or incurred by a Rite Aid . . . arising out of . . . the manufacture, distribution, sale, marketing and use [of LNK Products] . . . .

38.     Per the terms of the Rite Aid Supplier Agreement, LNK's indemnification obligation extends to both Rite Aid and Rite Aid's affiliates.

**v.     The SuperValu Supplier Agreement**

39.     The April 18, 2017 SuperValu Private Brands Supplier Terms and Conditions (the "SuperValu Supplier Agreement"), attached hereto as **Exhibit 5**, is an agreement between LNK

and SuperValu, Inc. ("SuperValu") that specifies the terms and conditions pursuant to which LNK is to provide SuperValu with LNK Products should SuperValu choose to purchase them.

40.     The SuperValu Supplier Agreement is not a contract for the purchase or sale of LNK Products and, by its explicit terms, "does not bind SUPERVALU to purchase any specific quantity of [LNK] Product[s]" and requires that "[a]ll purchases by SUPERVALU of the [LNK] Products from [LNK] shall be made only pursuant to a purchase order."

41.     The SuperValu Supplier Agreement requires LNK to defend and indemnify SuperValu for liability arising out of LNK Products and provides, in relevant part, that LNK:

> . . . [shall] indemnify, defend and hold SUPERVALU [and] its affiliates . . . harmless from and against any and all claims . . . to the extent such Claims are alleged to arise from . . . the labeling of any [LNK] Product by [LNK] violating any applicable federal or state food and drug. consumer safety, consumer fraud, or consumer "right to know" laws. . . .

42.     Per the terms of the SuperValu Supplier Agreement, LNK's indemnification obligation extends to both SuperValu and SuperValu's affiliates.

**vi.    The Walgreens Supplier Agreements**

43.     The November 1, 2020 Supply Agreement for Walgreen Branded and Other Merchandise (the "Walgreens Supplier Agreement"), attached hereto as **Exhibit 6**, is an agreement between LNK and Walgreen Co. ("Walgreen" or "Walgreens") that specifies the terms and conditions pursuant to which LNK is to provide Walgreens with LNK Products should Walgreens choose to purchase them.

44.     The Walgreens Supplier Agreement is not a contract for the purchase or sale of LNK Products and, by its explicit terms, provides that: 1) "Walgreen is not obligated or committed to purchase any quantities [of LNK Products] except as expressly ordered by

Walgreen"; and 2) Walgreens may contract to purchase LNK Products by placing "Orders" that LNK may "accept."

45.     The May 1, 2013 General Trade and Electronic Data Interchange Agreement for Walgreen Co. and/or Walgreens Health services for Purchases of RX and/or OTC Merchandise (the "Walgreens Trade Agreement," and together with the Walgreens Supplier Agreement, the "Walgreens Supplier Agreements"), attached hereto as **Exhibit 7**, is incorporated into the Walgreens Supplier Agreement by reference and obligates LNK to:

> defend, indemnify, and hold Walgreen . . . and affiliates . . . harmless from and against any and all claims, actions and proceedings in any way related to all or any of the merchandise covered by any purchase order . . . including. . . any claims or demands of any kind which any purchaser or user of such merchandise may make against Walgreen arising from the use of such merchandise. . . .

46.     Per the terms of the Walgreens Supplier Agreements, LNK's indemnification obligations extend to both Walgreens and its affiliates.

**vii.     The Walmart Supplier Agreement**

47.     The December 6, 2012 Supplier Agreement (the "Walmart Supplier Agreement"), attached hereto as **Exhibit 8**, is an agreement between LNK and, *inter alia*, Wal−Mart Stores, Inc. ("Walmart") that specifies the terms and conditions pursuant to which LNK is to provide Walmart with LNK Products should Walmart choose to purchase them.

48.     The Walmart Supplier Agreement is not a contract for the purchase or sale of LNK Products and, by its explicit terms, "does not impose upon [Walmart] any obligation to purchase [LNK Products]," and provides that Walmart may contract to purchase LNK products by submitting an "Order," the acceptance of which "may only be made by shipment of the [LNK Products]."

49.     The Walmart Supplier Agreement requires LNK to defend and indemnify Walmart for liability arising out of LNK Products and provides, in relevant part, that LNK is obligated to:

> . . . defend, hold harmless and indemnify [Walmart] . . . against any and all lawsuits, [and] claims . . . arising out of any actual or alleged . . . [v]iolation of any law, statute, ordinance, governmental administrative order, rule or regulation relating to the merchandise, or to any of its components or ingredients, or to its manufacture, shipment, labeling, use or sale . . . .

50.     Per the terms of the Walmart Supplier Agreement, LNK's indemnification obligation extends to both Walmart and its affiliates.

## II.   THE POLICY

51.     Due to the nature of LNK's business, including LNK's numerous contractual and indemnification obligations, LNK purchased the CNA Life Sciences Liability Policy No. ADT 2067458059 (the "Policy") to ensure that LNK had coverage in the event that either LNK or one of the Retailers incurs liability arising out of LNK Products.

52.     The Policy, attached hereto as **Exhibit 9**, is a "Claims-Made" policy that covers "CLAIMS ACTUALLY MADE AGAINST AN INSURED UNDER THE POLICY WHILE THE POLICY REMAINS IN EFFECT OR WHILE THE AUTOMATIC EXTENDED REPORTING PERIOD . . . IS IN EFFECT," and provides up to $10 million in Products-Work Hazard Coverage, excess of a $100,000 deductible per claim, and up to $5 million in Professional Services Coverage, excess of a $50,000 deductible per claim. *See* Policy at Addendum to the Application and Declarations; Endrs't 15.

53.     The Policy obligates CNA to indemnify LNK, and certain other "**Insureds**,"[1] for covered "**claims**," including "**products-work hazard claims**" and "**professional liability claims**," made against an "**Insured**" and reported to CNA during the "**policy period**, or during the **extended reporting period**, if any." *See id.* at § Products-Work Hazard Liability Coverage Part at 1; § Professional Liability Coverage Part at 1.

54.     The Policy also imposes on CNA a "duty to defend . . . any covered **claim** even if any of the allegations of such **claim** are groundless, false or fraudulent" and obligates CNA to "pay all **defense costs** . . . in connection with a covered **claim**," and provides that such "[**defense costs**] are included within and erode both the limits of liability and the deductible." *Id.*

55.     The Policy defines "**claim**" to include both a "demand for money or services" or "a civil proceeding . . . or any appeal therefrom" against the **Insured.** *Id.* § Glossary of Defined Terms ("Glossary") at 2.

56.     Under the Policy, "**defense costs**" include:

> fees charged by attorneys designated by the **Insurer** or by the **Insured** with the **Insurer's** prior written consent . . .
>
> [and] all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a covered **claim** if incurred by the Insurer, or by the Insured with the Insurer's prior written consent . . . .

*Id.* at 3.

### A.     The Policy Provides Coverage Both to LNK and to Certain Other Insureds, Including the Retailers

57.     The coverage guaranteed by the Policy extends to both LNK and to certain other Insureds, including, but not limited to, the Retailers.

---

[1] Bolded terms in this Complaint are terms that are both bolded in, and defined by, the Policy and have the same meaning as ascribed in the Policy.

58.     The Policy broadly defines "**Insured**" to include LNK – the "**Named Insured**" or

the "**Insured Entity**" – as well as certain other "**Insureds**," including, but not limited to:

> persons or organizations who are vendors of **insured products**, but they are **Insureds** only with respect to their liability for **damages** resulting from the distribution or sale of **insured products** in the regular course of their business;
>
> *****
>
> any other . . . organization to whom or to which [LNK] is obligated by virtue of a written contract, agreement or permit to provide such insurance as afforded by this policy, but only with respect to liability arising out of **insured product** or **insured work** performed by the [LNK] or on its behalf for that **Insured**; [and]
>
> *****
>
> CVS Caremark Corporation . . . [and] Walgreens. . . [but] exclusively for the vicarious liability imposed. . . due to [LNK's] negligence resulting from **insured product** or **insured work**; or . . . arising out of **professional services** performed by [LNK].

*Id.* § Glossary 7; Endrs't 8.

59.     The Policy defines "**insured product**" to include both:

> any goods or products . . . sold, leased, licensed, rented, handled, marketed, distributed to others . . . by [LNK] or others on [LNK's] behalf, including by not limited to . . . **pharmaceutical drugs** . . . or . . . containers. . ., materials, parts or equipment furnished in connection with such goods or products. . . . [and]
>
> warranties or representations made at any time with respect to the fitness, quality, durability, performance, use, handling, operation or safety of insured product; and . . . the providing of or failure to provide warnings or instructions.

*Id.* § Glossary 8.

60.     The Policy defines "**insured work**" as:

> work performed by [LNK] or on its behalf solely in connection with insured product . . . including, but not limited to testing, review, installation, maintenance, or repair of insured product. . . [and] . . . materials, parts or equipment furnished in connection with such work, operations or services . . . . **Insured work** [also] includes . . . warranties or representations made at any time with respect to the

fitness, quality, durability, performance, use, handling, operation, safety or maintenance of insured work; and . . . the providing of or failure to provide warnings or instructions.

*Id.* § Glossary 8

61.     Under the Policy, "**pharmaceutical drugs**" are defined as "synthetic or natural chemical[s] . . . intended for use in the diagnosis, cure, mitigation, treatment or prevention of injury, sickness or disease in humans and which affects the structure of any function of the human body" or a "component" of such a product. *Id.* § Glossary 12.

**B.     The Products-Work Hazard Coverage**

62.     The Policy's "Products-Work Coverage" obligates CNA to pay for:

all amounts. . . the **Insured** becomes legally liable to pay as **damages** as a result of . . . **bodily injur**y or **property damage** caused by an **occurrence** and arising out of a covered **products-work hazard claim** . . . provided that coverage applies to **claims** only if . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, . . . [and] such **occurrence** . . . first occurred on or after [October 1, 1985] . . . .

*Id.* § Products-Work Liability Coverage Part at 1 .

63.     If the "**bodily injury** [or] **property damage**" giving rise to that "**products-work hazard claim**" happened on or after 10/01/1985 but before 09/01/2006, the Policy will provide up to $5 million in Products-Work Hazard Coverage. *Id*. at Endrs't 14; Endrs't 15.

64.     If the "**bodily injury** [or] **property damage**" giving rise to that "**products-work hazard claim**" happened on or after 09/01/2006, the Policy will provide up to $10 million in Products-Work Hazard Coverage. *Id*.

65.     An "**occurrence**" is "an accident, including continuous or repeated exposure to the same general harmful conditions" and is "deemed to have occurred on the earliest date . . . **insured product**. . . giving rise to such **claim** was first ingested . . . ." *Id.* § Glossary at 11.

66.     A "**products-work hazard claim**" is a "**claim**" alleging "**bodily injury** . . .

arising out of **insured product** or **insured work**." *Id.* at 13-14.

67.     The Policy defines "**bodily injury**" to include

> bodily injury, sickness or disease sustained by a person, including
> death resulting from such injuries.  **Bodily injury** also means mental
> injury, mental anguish or shock sustained by that person as a result
> of such bodily injury, sickness or disease. **Bodily injury** also means
> bodily injury, sickness, disease, mental injury, mental anguish or
> shock sustained by any relative of that person as result of such
> **bodily injury**.

*Id.* at 2.

68.     Under the Policy, "**damages**" include "judgments, awards and settlements,

provided any settlement is made with the Insurer's prior written consent," but do not include

either "fees, costs and expenses paid or incurred or charged by the **Insured**, no matter whether

claimed as restitution, forfeiture, financial loss, set-off or otherwise . . ." or "plaintiff's attorney

fees associated with any of the above." *Id.* at 3-4; Endrs't 12.

69.     Paragraph D. of the Policy's original definition of "**damages**" states that

"[**d**]**amages** do not include . . . injunctive or declaratory relief."   However, Paragraph D was

deleted and replaced by Section I(B) of Policy Endorsement 12, which provides that:

> The section of the **GLOSSARY OF DEFINED TERMS** entitled
> **DAMAGES**, **Paragraph D.** is deleted in its entirety and replaced
> with the following:

> D.     [**Damages** do not include] interest on the full amount of a
>        judgment that accrues after entry of the judgment and before
>        the Insurer has paid, offered to pay or deposited in court the
>        part of the judgment.

*Id*.

C. **The Professional Services Coverage**

70. The Policy also provides "Professional Services Coverage" that obligates CNA to pay "all amounts . . . that the Insured becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured** or by someone for whom the **Insured** is liable, provided that. . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

71. If the "**wrongful act**" giving rise to that "**professional liability claim**" happened on or after 10/08/2020 but before 10/19/2021, the Policy will provide up to $3 million in Professional Services Coverage. *Id*. at Endrs't 14; Endrs't 15.

72. If the "**wrongful act**" giving rise to that "**professional liability claim**" happened on or after 10/19/2021, the Policy will provide up to $5 million in Professional Services Coverage. *Id*. at Endrs't 14; Endrs't 15.

73. The Policy defines "**professional liability claim**" to include "a **claim** alleging a **wrongful act** in the rendering of, or failure to render, **professional services** . . . ." *Id.* § Glossary 2, 5, 13.

74. A "**wrongful act**" is "any actual or alleged negligent act, error or omission in the rendering of **professional services** by any **Insured** on [LNK's] behalf." *Id.* at 14.

75. "**Professional services**" include both:

those services performed by [LNK], or by any other **Insured** on its behalf, for a fee or other remuneration, provided such services are specified in a written contract or agreement for the performance of **professional services** between [LNK] and its client, which contract was entered into prior to the date of the **wrongful act** giving rise to the **claim** and after [October 8, 2020]; [and]

services incidental to those services specified in such written contract or agreement which incidental services must be done to

fulfill the contract and are agreed to by the [LNK] orally or in writing after the execution of the written contract. . . .

*Id.* at 13.

### D.   The Cancellation of the Policy and the Extended Reporting Period

76.     Frustrated with CNA's refusal to meet its obligations with respect to any of LNK's claims for coverage, LNK felt compelled to replace its coverage with CNA.

77.     The Policy was cancelled by an endorsement (the "Cancellation Endorsement"), attached hereto as **Exhibit 10**.  The Cancellation Endorsement provides that the Policy is "cancelled in accordance with the terms and conditions of the [P]olicy," effective as of June 15, 2022, and that "[a]ll other terms and conditions of the policy remain unchanged."

78.     The Policy guarantees LNK a 90-day automatic extended reporting period and provides that "UPON TERMINATION OF COVERAGE FOR ANY REASON, A NINETY (90) DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL BE GRANTED AT NO ADDITIONAL CHARGE." *See* Policy at Addendum to the Application and Declarations.

79.     The "**extended reporting period**" includes "the period of time after the end of the **policy period** for the reporting of **claims** to the Insurer that are made against the Insured during the applicable extended reporting period. . . ." *Id.* § Glossary at 4-5.

80.     The Policy requires LNK to notify CNA of "as soon as reasonably possible of any **claim** . . . but in no event later than ninety days (90) after termination or expiration of the **coverage relationship**, or during the **extended reporting period**. . . ." *See id.* § Common Conditions at 3-4.

81.     CNA asserts that, pursuant to the Extended Reporting Period section of the Common Policy Conditions, the automatic "**extended reporting period**" only applies "if no other insurance purchased by the Insured Entity to replace this [P]olicy applies." However, CNA

completely ignores Endorsement 12 of the Policy, which provides that "the section of the **COMMON CONDITIONS** entitled **Extended Reporting Period** is deleted in its entirety." *Id.* at Endrs't 12.

82.     Endorsement 12 also provides that "[i]n the event of **termination of coverage** . . . a ninety (90) day automatic **Extended Reporting Period** will be granted to the **Insured Entity** at no charge in which any **claim** reported will be considered as having been made before the termination date of this policy." *Id.*

83.     No language in Endorsement 12 eliminates LNK's entitlement to the automatic "**extended reporting period**" if LNK purchases a replacement policy with another insurer.

84.     Therefore, the Policy guarantees LNK a ninety-day automatic "**extended reporting period**" that expires on September 13, 2022.

### III.     THE UNDERLYING ACTIONS

#### A.     <u>Non-Drowsy Actions</u>

85.     As of the filing of this Complaint, seven Retailers have been named as defendants in eight separate putative class-action lawsuits, each of which alleges that:

      a.     the respective Retailer sold store-branded medications that contained Dextromethorphan Hydrobromide ("DXM");

      b.     DXM causes drowsiness; and

      c.     the defendant Retailer improperly labeled medications containing DXM as "Non-Drowsy" (the "Non-Drowsy Products").

86.     In addition to the eight known and existing actions, a list of which is included at Appendix A, LNK anticipates that additional lawsuits with substantially identical allegations may be initiated against additional Retailers (collectively, the "Non-Drowsy Actions").

87.     The Non-Drowsy Products at issue in the Non-Drowsy Actions are store-branded, OTC medications, including, but not limited to:

a.  "CVS Health Severe Tussin CF";

b.  "CVS Health-branded Tussin DM";

c.  "Equate Daytime Tussin DM Max";

d.  "Non-Drowsy Walgreens Product (Wal-Tussin DM)";

e.  "Rite Aid 'Non-Drowsy' Daytime Severe Cold & Flu Relief";

f.  "Meijer Daytime Severe Cold & Flu"; and

g.  "Signature Care 'Non-Drowsy' Daytime Severe Cold & Flu Relief."

88.   The operative complaints filed in the existing Non-Drowsy Actions (the "Non-Drowsy Complaints,"), attached hereto as **Exhibits 11-18**, assert substantially similar causes of action, including causes of action for:

a.  Violation of state consumer protection acts;

b.  Breach of express and implied warranty;

c.  Breach of the Magnuson-Moss Warranty Act;

d.  Negligent and/or intentional misrepresentation; and/or

e.  Unjust enrichment and/or restitution.

89.   The plaintiffs in each of the existing Non-Drowsy Actions (the "Non-Drowsy Plaintiffs") seek substantially similar relief, including relief in the form of damages, including statutory, treble, and/or punitive damages, as well as injunctive relief.

90.   LNK has received numerous tenders from Retailers that are named as defendants in the Non-Drowsy Actions, each demanding that LNK defend and indemnify that Retailer pursuant to the term of its respective Supplier Agreement.  Such tenders include:

a.  a January 3, 2022 email wherein CVS demanded that LNK defend and indemnify CVS in the *Larusso* Action (the "CVS Tender," attached hereto as **Exhibit 19**);

      b.    a January 14, 2022 letter wherein Walmart "tender[ed] for defense and indemnification for the [Goldstein] matter" (the "Walmart Tender," attached hereto as **Exhibit 20**);

      c.    a January 17, 2022 email wherein Walgreens tendered to LNK and "request[ed] that [LNK] defend and indemnify Walgreens" (the "Walgreens Tender," attached hereto as **Exhibit 21**);

      d.    a March 2, 2022 letter wherein Meijer tendered to LNK and demanded that LNK "agree[] to indemnify and hold Meijer harmless from" and "defend Meijer's interests in" the *Moore* Action (the "Meijer Tender," attached hereto as **Exhibit 22**);

      e.    a March 9, 2022 email wherein Rite Aid "request[s] defense and indemnification from LNK" with respect to the *Lemus* Action (the "Rite Aid Tender," attached hereto as **Exhibit 23**);

      f.    a June 17, 2022 letter wherein Albertsons "tender[ed] defense and request[ed] indemnification with respect to allegations in the [*Gibson*] Complaint and any claims or actions arising therefrom" (the "Albertsons Tender," attached hereto as **Exhibit 24**); and

      g.    a June 24, 2022 letter wherein United Natural Foods, Inc. ("UNFI") identified SuperValu as UNFI's wholly-owned subsidiary and requested that LNK defend and indemnify SuperValu in the *Harris* Action (the "SuperValu Tender," attached hereto as **Exhibit 25**).

91.    In addition to above-listed tenders, LNK anticipates receiving additional tenders from Retailers for other Non-Drowsy Actions (collectively, the "Non-Drowsy Tenders").

92.    LNK is not a named defendant in any of the Non-Drowsy Actions.

93.    However, each of the existing Non-Drowsy Tenders alleges, explicitly or implicitly, that the Non-Drowsy Products at issue in the respective Non-Drowsy Action include LNK Products.  Such LNK Products may have been manufactured or packaged pursuant to certain Purchase Orders executed by and between Retailers and LNK on or after October 8, 2020, including, but not limited to, the Purchase Orders attached hereto as **Exhibits 26-32**.

B.     **The Rapid Release Actions**

94.     As of the filing of this Complaint, LNK has been named as a defendant in three

separate putative class-action lawsuits, each alleging that:

> a.     LNK manufactures and packages certain store-branded acetaminophen
> tablets that are marketed as "Rapid Release Gelcaps";
>
> b.     the Rapid Release Gelcaps dissolve more slowly than the same store-
> branded non-rapid-release acetaminophen tablets; and
>
> c.     because the Rapid Release Gelcaps are sold at a higher price than their
> non-rapid-release counterparts, plaintiffs were harmed by the allegedly
> false and misleading labels.

95.     In addition to the three existing actions, a list of which is included at Appendix A,

LNK anticipates that additional lawsuits with substantially identical allegations may be initiated

against LNK and/or additional Retailers (collectively, the "Rapid Release Actions").

96.     The Rapid Release Gelcaps at issue in the Rapid Release Actions are store-

branded, OTC medications, including, but not limited to, "Signature Care Rapid Release

Acetaminophen Gelcaps."

97.     The operative complaints filed in the existing Rapid Release Actions (the "Rapid

Release Complaints"), attached hereto as **Exhibits 33-35**, assert substantially similar causes of

action, including causes of action for:

> a.     Violation of state consumer protection acts;
>
> b.     Breach of express and implied warranty;
>
> c.     Unjust enrichment/restitution;
>
> d.     Negligent misrepresentation; and/or
>
> e.     Fraud.

98.     The plaintiffs in each Rapid Release Action (the "Rapid Release Plaintiffs") seek substantially similar relief, including relief in the form of actual, compensatory, statutory, and/or punitive damages, as well as injunctive relief.

99.     LNK has received multiple tenders from Retailers that are named as defendants in the Rapid Release Actions, including, but not limited to, the tender attached hereto as **Exhibit 36**, wherein the respective Retailers demand that LNK defend and indemnify that Retailer pursuant to the term of its respective Supplier Agreement.

100.    In addition to the above-mentioned tenders, LNK anticipates receiving additional tenders from Retailers for other Rapid Release Actions (collectively, the "Rapid Release Tenders").

101.    The Rapid Release Gelcaps at issue in the Rapid Release Actions may include LNK Products that were manufactured or packaged pursuant to certain Purchase Orders executed by and between Retailers and LNK on or after October 8, 2020, including, but not limited to, the Purchase Orders attached hereto as **Exhibits 37-38**.

**C.      The APAP Actions**

102.    As of the filing of this Complaint, LNK is aware of 15 separate lawsuits against Retailers, each alleging that:

      a.      the respective Retailer manufactures and markets paracetamol, also known as acetaminophen (hereinafter, "APAP Products");

      b.      use of APAP Products by pregnant women alters fetal development and significantly increases the risk that child will develop autism spectrum disorder ("ASD") and/or attention-deficit/hyperactivity disorder ("ADHD"); and

      c.      the respective Retailer improperly markets OTC APAP Products as a safe pain reliever for pregnant women and failed to warn consumers of the known risks.

      d.      APAP Plaintiffs relied on the Retailer's representation that APAP was safe, used APAP during pregnancy, and gave birth to a child who was subsequently diagnosed with ASD and/or ADHD.

103.     In addition to the 15 existing actions, a list of which is included at Appendix A, LNK anticipates that additional lawsuits with substantially identical allegations may be initiated against additional Retailers (collectively, the "APAP Actions").

104.     The operative complaints filed in the existing APAP Actions (the "APAP Complaints"), attached hereto as **Exhibits 39-53**, assert substantially similar causes of action, including causes of action for:

      a.      violation of consumer protection laws;

      b.      breach of express and implied warranty;

      c.      strict liability for failure to warn;

      d.      negligence; and

      e.      negligent misrepresentation.

105.     The plaintiffs in each of the existing APAP Actions (the "APAP Plaintiffs") include a mother ("Plaintiff Mother"), suing on behalf of herself and as the mother and general guardian of a minor ("Plaintiff Child"), and alleging that the Plaintiff Mother purchased and/or used APAP Products while pregnant at various times, but in no event before October 1, 1985, and that Plaintiff Child was subsequently diagnosed with ASD or ADHD.

106.     The APAP Plaintiffs all seek substantially similar relief, including such relief as:

      a.      Compensatory damages for past, present, and future damages, economic damages, together with interest and costs as provided by law;

      b.      Punitive or enhanced compensatory damages; and/or

      c.      All ascertainable economic damages.

107.     LNK has received multiple tenders from Retailers that are named as defendants in the APAP Actions, attached hereto as **Exhibits 54-56**, wherein the respective Retailer demands

that LNK defend and indemnify that Retailer pursuant to the term of its respective Supplier Agreement.

108.    In addition to the above-mentioned tenders, LNK anticipates receiving additional tenders from Retailers for other APAP Actions (collectively, the "APAP Tenders").

109.    LNK is not a named defendant in the APAP Actions.

110.    However, each of the existing APAP Tenders alleges, explicitly or implicitly, that the APAP Products at issue in the respective APAP Action include LNK Products.  Such LNK Products may have been manufactured or packaged pursuant to certain Purchase Orders executed by and between Retailers and LNK, including, but not limited to, the Purchase Orders attached hereto as **Exhibits 57-59**.

## IV.    CNA BREACHED ITS POLICY OBLIGATIONS BY WRONGFULLY DENYING COVERAGE FOR THE NON-DROWSY CLAIMS

111.    LNK timely notified CNA of LNK's claim for coverage with respect to both the Non-Drowsy Tenders and the Non-Drowsy Actions (collectively, the " Non-Drowsy Claims").

112.    CNA has denied coverage for seven of the eight Non-Drowsy Claims.  *See* **Exhibits 60-66** (the "Non-Drowsy Denials").  Upon information and belief, CNA intends to deny coverage for the eighth Non-Drowsy Claim and for any subsequent claim for coverage arising out of any future Non-Drowsy Actions.

113.    In the Non-Drowsy Denials, CNA denies coverage for the Non-Drowsy Claims on substantially similar grounds, including that the Non-Drowsy Claims:

      a.    do not allege "**professional services**" by LNK;

      b.    do not involve "**damages**" as defined by the Policy; and/or

      c.    were not made and/or reported to LNK before the cancellation of the Policy.

114.    As each of the Non-Drowsy Tenders and each of the Non-Drowsy Actions is a covered "**claim**," CNA's purported bases for issuing the Non-Drowsy Denials are meritless and constitute a breach of CNA's obligations under the Policy.

**A.    Each of the Non-Drowsy Tenders Constitutes a Covered Professional Liability Claim**

115.    Each of the Non-Drowsy Tenders is a request or demand by a Retailer for defense and indemnity from LNK for any liability the Retailer may incur with respect to a Non-Drowsy Action that alleges damages arising out of the mislabeling of Non-Drowsy Products, including LNK Products, purchased by the Non-Drowsy Plaintiffs.

116.    Each of the named Non-Drowsy Plaintiffs seeks to represent a class of individuals that purchased Non-Drowsy Products during the time period within the applicable statute of limitations and up through the final judgment in that Non-Drowsy Action.

117.    Therefore, each of the Non-Drowsy Tenders is a "demand for money or services" that alleges a "negligent act, error or omission" in the manufacture or packaging of LNK Products "performed by [LNK] . . . for a fee or other remuneration" as specified in one or more Purchase Orders that constitute "a written contract or agreement . . . entered into prior to the date of the **wrongful act** giving rise to the **claim** and after [October 8, 2020]."

118.    Each Non-Drowsy Tenders is therefore a covered "**professional liability claim**" within the meaning of the Policy and CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the Non-Drowsy Tenders.

**B.    Each of the Non-Drowsy Actions Alleges a Covered Professional Liability Claim**

119.    In each of the Non-Drowsy Actions, the Non-Drowsy Plaintiffs seek to recover damages arising out of the alleged mislabeling of Non-Drowsy Products, including LNK

25

Products, purchased by the Non-Drowsy Plaintiffs during the time period within the applicable statute of limitations and up through the final judgment in that Non-Drowsy Action.

120.    Each of the Non-Drowsy Actions is therefore "a civil proceeding" alleging a "negligent act, error or omission" arising out of the manufacture or packaging of LNK Products that LNK "performed. . . for a fee or other remuneration" pursuant to one or more Purchase Orders, which are "a written contracts or agreements" for the manufacture and packaging of LNK Products, that were "entered into prior to the date of the **wrongful act** giving rise to the **claim** and after [October 8, 2020]."

121.    Each Non-Drowsy Action therefore alleges a "**professional liability claim**" within the meaning of the Policy, and CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the Non-Drowsy Actions.

### C.    CNA'S Purported Bases for Denying Coverage for the Non-Drowsy Claims Are Meritless

#### i.    The Non-Drowsy Claims Allege "Damages" Within the Meaning of the Policy

122.    In the Non-Drowsy Denials, CNA insists that Policy's definition of "**damages**" excludes claims for reimbursement, disgorgement, civil fines, the multiplied portion of multiplied award, and injunctive relief, and therefore that the Non-Drowsy Claims do not allege "**damages**" within the meaning of the Policy.

123.    CNA also insists that, under Paragraph D of the Policy's original definition of "**damages,**" "injunctive relief is. . . excluded from the definition of 'damages,'" despite the fact that Paragraph D was deleted by Endorsement 12 of the Policy.

124.    Each of the Non-Drowsy Complaints plainly seeks an award of compensatory, statutory, treble, and/or punitive damages, as well as injunctive relief, which qualify as covered "**damages**" within the meaning of the Policy.

125.     CNA insists that the Non-Drowsy Complaints allege only statutory damages, even though the Non-Drowsy Claims plainly seek both damages and statutory damages.  Even if CNA is correct (which it is not),  LNK has repeatedly pointed out that, under New York law, statutory damages qualify as damages under a liability policy.  CNA has refused to reconsider its Denials.

126.     Further, no reasonable insurer would deny coverage based on a Policy provision that has been deleted by endorsement.  CNA's assertion that "injunctive relief" is excluded from the definition of damages is therefore meritless and constitutes a breach of CNA's duty of good faith and fair dealing.

### ii.     The Non-Drowsy Claims Allege "Professional Services" by LNK

127.     In the Non-Drowsy Denials and subsequent correspondence with LNK, CNA justified its refusal to defend LNK with respect to the Non-Drowsy Tenders on the grounds that LNK is not a named defendant in the Non-Drowsy Actions and therefore the Non-Drowsy Complaints do allege "**professional services**" by LNK.

128.     CNA also insists that the Non-Drowsy Claims allege services performed pursuant to the Supplier Agreements and therefore do not allege "**professional services**" performed pursuant to a contract entered into after October 8, 2020.

129.     Contrary to CNA's assertion, the Supplier Agreements are not contracts for the manufacture, packaging or sale of any LNK Products. Any LNK Products that are, or may be, at issue in the Non-Drowsy Actions were manufactured, packaged, and sold pursuant to Purchase Orders executed by LNK on or after October 8, 2020.

130.     The Non-Drowsy Tenders, which demand defense and indemnity for the Non-Drowsy Actions, therefore explicitly and/or implicitly allege that the Non-Drowsy Actions arise out of "**wrongful acts**" in the manufacture, packaging, and/or selling of LNK Products pursuant to Purchase Orders executed on or after October 8, 2020.

131.    Neither the Policy, nor New York law, requires LNK to be a named defendant in order to obtain coverage for the Non-Drowsy Claims, as CNA has actual knowledge that LNK manufactures and packages LNK Products that are, or may be, at issue in the Non-Drowsy Actions.

132.    CNA is also aware that, pursuant to the terms of the Supplier Agreements, LNK is, or may be, contractually obligated to defend and indemnify the Retailers for claims related to LNK Products.

133.    Thus, both the Non-Drowsy Actions and the Non-Drowsy Tenders allege "**professional services**" by LNK within the meaning of the Policy, and CNA also has actual knowledge of facts that establish a reasonable possibility that LNK may incur liability with respect to the Non-Drowsy Claims, irrespective of whether LNK is ever sued in the underlying Non-Drowsy Actions.

134.    Rather than defending its insured and seeking to ensure that LNK is not named as a defendant in the underlying actions, CNA purports to require that LNK become a named defendant before defense coverage is available.

135.    Because CNA's duty to defend is triggered regardless of whether LNK is named as a defendant in the Non-Drowsy Actions, CNA's withholding of coverage unless LNK risks further liability by being sued is unreasonable, evinces a gross disregard for LNK's interests, and violates CNA's duty of good faith and fair dealing.

> **iii.    Each Non-Drowsy Claim Was Both Made Against LNK, and Reported to CNA, During the Policy Period and/or the Automatic Extended Reporting Period**

136.    CNA also insists that several of the Non-Drowsy Claims were not made and reported to CNA during the "**policy period**" or any "**extended reporting period**" because the Policy was cancelled as of June 15, 2022, and the Policy only provides for a ninety-day

"automatic **extended reporting period**" if "no other insurance purchased by [LNK] to replace this [P]olicy applies." *See e.g.*, Ex. 65 at 9; Policy § Common Conditions at 4.

137.     However, Policy Endorsement 12 deletes this limitation on the "automatic **extended reporting period.**"

138.     Therefore, under the terms of the Policy, including the Cancellation Endorsement, after LNK cancelled the Policy, "a ninety (90) day automatic **Extended Reporting Period**" was granted to LNK "at no charge in which any **claim** reported will be considered as having been made before the termination date of this policy." *See* Policy at Endrs't 12.

139.     The Cancellation Endorsement provides that the effective date for the cancellation of the Policy is June 15, 2022, meaning that the "90-day automatic Extended Reporting Period" applies and any "**claim**" that LNK reports between June 15, 2022 and September 13, 2022 will be considered as having been made before the termination date of the Policy.

140.     In the Non-Drowsy Denials, CNA acknowledges the Non-Drowsy Claims were made and reported to CNA on or before the expiration of the 90-day window.

141.     Because the Non-Drowsy Claims were made and reported to CNA within the "**policy period**" and/or the automatic "**extended reporting period**," CNA is obligated to provide coverage.

142.     Because no reasonable insurer would deny coverage based on a Policy provision that has been deleted by endorsement, CNA's denials constitute a breach of CNA's duty of good faith and fair dealing.

**V.     CNA BREACHED ITS POLICY OBLIGATIONS BY WRONGFULLY DENYING COVERAGE FOR THE RAPID RELEASE CLAIMS**

143.     LNK timely notified CNA of LNK's claim for coverage with respect to the Rapid Release Actions and the Rapid Release Tenders (collectively, the "Rapid Release Claims").

144.    CNA has denied coverage for two of the three Rapid Release Claims on substantially similar grounds, including that the Rapid Release Claims:

      a.    do not allege "**professional services**" by LNK;

      b.    do not involve "**damages**" as defined by the Policy; and/or

      c.    were not made and/or reported to LNK before the cancellation of the Policy.

*See* **Exhibits 67-68** (the "Rapid Release Denials").

145.    Upon information and belief, CNA intends to deny coverage for the third Rapid Release Claim, and for any subsequent claim for coverage arising out of any future Rapid Release Actions, on the same grounds.

146.    As each of the Rapid Release Actions and each of the Rapid Release Tenders is a covered "**claim**," CNA's purported bases for issuing the Rapid Release Denials are meritless and constitute a breach of CNA's obligations under the Policy.

## A.    Each of the Rapid Release Tenders Constitutes a Covered Professional Liability Claim

147.    Each of the Rapid Release Tenders is a request or demand by a Retailer for defense and indemnity from LNK for any liability the Retailer may incur with respect to a Rapid Release Action that alleges damages arising out of the mislabeling of Rapid Release Gelcaps, including LNK Products, purchased by the Rapid Release Plaintiffs.

148.    Each of the named Rapid Release Plaintiffs seeks to represent a class of individuals that purchased Rapid Release Plaintiffs during the time period within the applicable statute of limitations and up through the final judgment in that Rapid Release Action.

149.    Therefore, each of the Rapid Release Tenders is a "demand for money or services" that alleges a "negligent act, error or omission" in the manufacture or packaging of LNK Products "performed by [LNK] . . . for a fee or other remuneration" as specified in one or more

Purchase Orders that constitute "a written contract or agreement . . . entered into prior to the date of the **wrongful act** giving rise to the **claim** and after [October 8, 2020]."

150.     Each Rapid Release Tender is therefore a covered "**professional liability claim**" within the meaning of the Policy and CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the Rapid Release Tenders.

**B.     Each of the Rapid Release Actions Alleges a Covered Professional Liability Claim**

151.     In each of the Rapid Release Actions, the Rapid Release Plaintiffs seek to recover damages arising out of the alleged mislabeling of Rapid Release Gelcaps, including LNK Products, purchased by the Rapid Release Plaintiffs during the time period within the applicable statute of limitations and up through the final judgment in that Rapid Release Action.

152.     Each of the Rapid Release Actions is therefore "a civil proceeding" alleging a "negligent act, error or omission" arising out of the manufacture or packaging of LNK Products that LNK "performed. . . for a fee or other remuneration" pursuant to one or more Purchase Orders, which are "a written contracts or agreements" for the manufacture and packaging of LNK Products, that were "entered into prior to the date of the **wrongful act** giving rise to the **claim** and after [October 8, 2020]."

153.     Each of the Rapid Release Actions therefore alleges a "**professional liability claim**" within the meaning of the Policy, and CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the Rapid Release Actions. *See* Policy § Professional Liability Coverage at 1.

**C.    CNA's Purported Bases for Denying Coverage for the Rapid Release Claims Are Meritless**

**i.    The Rapid Release Actions Allege "Damages" Withing the Meaning of the Policy**

154.    In the Rapid Release Denials, CNA insists that Policy's definition of "**damages**" excludes claims for "actual damages in the form of 'full restitution,' reimbursement, recovery of attorneys' fees, punitive damages, an injunction disgorgement, civil fines, the multiplied portion of multiplied award, and injunctive relief," and therefore that the Rapid Release Claims do not allege "damages" within the meaning of the Policy.

155.    CNA insists that the Rapid Release Complaints allege only statutory damages, even though they plainly both damages and statutory damages.  Even if CNA is correct (which it is not),  LNK has repeatedly pointed out that, under New York law, statutory damages qualify as damages under a liability policy.  CNA has refused to reconsider its Denials.

156.    CNA also ignores the fact that the Policy language excluding "injunctive relief" from the definition of "**damages**" was deleted by Endorsement 12.

157.    No reasonable insurer would deny coverage based on a Policy provision that has been deleted by endorsement and CNA's Rapid Release Denials are therefore meritless and constitute a breach of CNA's duty of good faith and fair dealing.

**ii.    The Rapid Release Actions Allege "Professional Services" by LNK**

158.    In the Rapid Release Denials, CNA justified its refusal to defend LNK on the grounds that the Rapid Release Actions do not constitute "**professional services**" because they do not "allege any service provided by LNK to the [Rapid Release P]laintiffs."

159.    However, the Policy only requires allegations of a "**wrongful act** in the rendering of, or the failure to render, **professional services**," not **professional services** "provided to the named plaintiff in a civil proceeding."

160.     CNA also refuses to defend LNK on the grounds that the Rapid Release Actions allege services arising out of the Supplier Agreements and therefore do not allege services performed pursuant to a contract entered into after October 8, 2020.

161.     However, by their terms, the Supplier Agreements are not contracts for the manufacture, packaging or sale of any LNK Products, and the LNK Products that are or may be at issue in the Rapid Release Actions include LNK Products that were manufactured, packaged, and sold pursuant to Purchase Orders executed by LNK on or after October 8, 2020.

162.     Therefore, the Rapid Release Complaints allege "**professional services**" within the meaning of the Policy, and CNA also has actual knowledge of facts that establish a reasonable possibility that LNK may incur liability with respect to the Rapid Release Actions.

163.     Thus, CNA is obligated to defend and indemnify LNK with respect to the Rapid Release Actions.

### iii.     The Rapid Release Actions Were Both Made Against LNK, and Reported to CNA, During the Policy Period

164.     CNA also insists that several of the Rapid Release Actions were not made and reported to CNA during the "**policy period**" or any "**extended reporting period**" because the Policy was cancelled as of June 15, 2022, and the Policy only provides for a ninety-day "automatic **extended reporting period**" if "no other insurance purchased by [LNK] to replace this [P]olicy applies."  *See e.g.*, Ex. 66 at 9; Policy § Common Conditions at 4.

165.     However, Policy Endorsement 12 deletes this limitation on the "automatic **extended reporting period.**"

166.     Therefore, under the terms of the Policy, including the Cancellation Endorsement, after LNK cancelled the Policy, "a ninety (90) day automatic **Extended Reporting Period**" was

granted to LNK "at no charge in which any **claim** reported will be considered as having been made before the termination date of this policy." *See* Policy at Endrs't 12.

167.     The Cancellation Endorsement provides that the effective date for the cancellation of the Policy is June 15, 2022, meaning that the "90-day automatic Extended Reporting Period" applies and any "**claim**" that LNK reports between June 15, 2022 and September 13, 2022 will be considered as having been made before the termination date of the Policy.

168.     In the Rapid Release Denials, CNA acknowledges the Rapid Release Actions were made and reported to CNA on or before the expiration of the 90-day window.

169.     Because the Rapid Release Actions were made and reported to CNA within the "**policy period**" and/or the automatic "**extended reporting period**," CNA is obligated to provide coverage.

170.     Because no reasonable insurer would deny coverage based on a Policy provision that has been deleted by endorsement, CNA's denials constitute a breach of CNA's duty of good faith and fair dealing.

## VI.     CNA HAS BREACHED ITS POLICY OBLIGATIONS BY WRONGFULLY FAILING TO PROVIDE COVERAGE FOR THE APAP CLAIMS

171.     LNK timely notified CNA of LNK's claim for coverage with respect to both the APAP Tenders and the APAP Actions (collectively, the "APAP Claims").

172.     CNA has already denied coverage for two of the fifteen APAP Claims.  *See* **Exhibits 69-70** (the "APAP Denials").  Upon information and belief, CNA intends to deny coverage for the remaining APAP Claims and for any subsequent claim for coverage arising out of any future APAP Actions.

173.     In the APAP Denials, CNA denies coverage on the grounds that the APAP Claims:

> a.     are not "**claims**" made against LNK; and
>
> b.     were not made and/or reported to LNK before the cancellation of the Policy.

174.     As each of the APAP Tenders and each of the APAP Actions is a covered "**claim**," CNA's purported bases for issuing the APAP Denials are meritless and constitute a breach of CNA's obligations under the Policy.

**A.    <u>The APAP Tenders Each Constitute a Covered Products-Work Hazard Claim</u>**

175.     Each of the APAP Tenders is a request or demand by a Retailer for defense and indemnity from LNK for any liability the Retailer may incur with respect to an APAP Action that alleges damages arising out of "bodily injury", "mental injury", "sickness", and/or "disease" sustained by the APAP Plaintiffs, as well as mental anguish sustained by the Plaintiff Mothers, that was caused by an "accident," and specifically the "continuous or repeated exposure to" LNK Products. *See* Policy § Glossary at 2.

176.     Each of the APAP Complaints states that the alleged damages relate to the use or purchase of LNK Products occurring after October 1, 1985.

177.     Therefore, as each of the APAP Tenders is a "demand for money or services" that alleges "bodily injury" caused by an "occurrence," the APAP Tenders constitute covered "**products-work hazard claims**" within the meaning of the Policy.

178.     Thus, CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the APAP Tenders.

**B.    <u>The APAP Actions Each Allege a Covered Products-Work Hazard Claim</u>**

179.     The APAP Actions are each a "a civil proceeding" alleging both "bodily injury", "mental injury", "sickness", and/or "disease" sustained by the APAP Plaintiffs, as well as mental

anguish sustained by the Plaintiff Mothers, that was caused by an "accident," and specifically the "continuous or repeated exposure to" LNK Products.  *See* Policy § Glossary at 2..

180.     As each of the APAP Actions alleges "**bodily injury**" caused by an "**occurrence**" and arising out of a "**products-work hazard claim**" within the meaning of the Policy, CNA is obligated to defend and indemnify LNK for all "**damages**" and "**defense costs**" that LNK incurs with respect to the APAP Actions.  *See* Policy § Products-Work Hazard Liability at 1.

181.     Therefore, CNA's denial of coverage for the APAP Actions constitutes a breach of CNA's contractual obligations under the Policy.

### C.     CNA's Purported Bases for Denying Coverage for the APAP Claims Are Meritless

#### i.     The APAP Claims Are "Claims" Asserted Against LNK

182.     CNA insists that, because LNK is not a named defendant in the APAP Actions, the APAP Claims are not "**claims**" against LNK.

183.     However, the APAP Tenders are explicit demands for money or services made by Retailers directly to LNK.

184.     Moreover, though LNK is not a named defendant in the APAP Actions, CNA has actual knowledge of facts that establish a reasonable possibility that LNK may incur liability with respect to the APAP Claims, irrespective of whether LNK is ever sued in the underlying APAP Actions, including that:

      a.     LNK manufactures and packages LNK Products that are, or may be, at issue in the APAP Actions; and

      b.     pursuant to the terms of the Supplier Agreements, LNK is, or may be, contractually obligated to defend and indemnify the Retailers for claims related to LNK Products.

185.     Under such circumstances, neither the Policy, nor New York law requires LNK to be a named defendant in order to obtain coverage for the APAP Claims.

186.     Rather than defending its insured and seeking to ensure that LNK is not named as a defendant in the underlying actions, CNA purports to require that LNK become a named defendant before defense coverage is available.

187.     Because CNA's duty to defend is triggered regardless of whether LNK is named as a defendant in the APAP Actions, CNA's withholding of coverage unless LNK risks further liability by being sued is unreasonable, evinces a gross disregard for LNK's interests, and violates CNA's duty of good faith and fair dealing.

> **ii.     The APAP Claims Were Both Made Against LNK, and Reported to CNA, During the Policy Period**

188.     Under the terms of the Policy, including the Cancellation Endorsement, after LNK cancelled the Policy, "a ninety (90) day automatic **Extended Reporting Period**" was automatically granted to LNK "at no charge in which any **claim** reported will be considered as having been made before the termination date of this policy."  *See* Policy at Endrs't 12.

189.     The Cancellation Endorsement provides that the effective date for the cancellation of the Policy is June 15, 2022, meaning that the "90-day automatic Extended Reporting Period" applies and any "**claim**" that LNK reports between June 15, 2022 and September 13, 2022 will be considered as having been made before the termination date of the Policy.

190.     CNA acknowledges that the APAP Claims were made and reported to CNA within the 90-day window.

191.     Because the APAP Claims were made and reported to CNA with the "**policy period**" and/or the automatic "**extended reporting period**", CNA is obligated to provide coverage.

192.     Because no reasonable insurer would deny coverage based on a Policy provision that has been deleted by endorsement, CNA's denials constitute a breach of CNA's duty of good faith and fair dealing.

*****

## FIRST CAUSE OF ACTION
### Declaratory Judgment
### Regarding CNA's Duty to Defend the Non-Drowsy Actions and Non-Drowsy Tenders

193.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-192 of this Complaint as if fully set forth herein.

194.     The Policy constitutes a valid and enforceable contract in which LNK has a lawful interest.

195.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . . provided that. . . . such claim is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

196.     LNK is "Insured" under the Policy.

197.     Each of the Non-Drowsy Actions, and each of the related Non-Drowsy Tenders, constitutes a covered "**professional liability claim**" for "**damages**" arising out of a "**wrongful act**" that occurred on or after October 8, 2020, as those terms are defined in the Policy.

198.     Each of the Non-Drowsy Actions, and each of the related Non-Drowsy Tenders, is a claim that was made and reported to CNA before the termination of the Policy and/or before the end of the automatic ninety-day "**extended reporting period**."

199.     LNK gave CNA timely notice of each of the Non-Drowsy Actions and Non-Drowsy Tenders in accordance with the terms of the Policy.

200.     LNK has fully complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions, or prerequisites as a result of LNK's breaches and/or other conduct.

201.     No conditions, exclusions or provisions of the Policy completely bar coverage for the Non-Drowsy Actions or the Non-Drowsy Tenders. Thus, CNA is obligated to defend LNK or to provide coverage for LNK's defense costs, subject to the policy limits.  CNA, however, has denied this obligation.

202.     LNK has sustained, and is continuing to sustain, a substantial amount of fees and expenses in defense of the Non-Drowsy Actions and Non-Drowsy Tenders.

203.     As a result, an actual and justiciable controversy exists between the parties regarding the existence and scope of CNA's obligations under the Policy to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Non-Drowsy Actions and Non-Drowsy Tenders, subject to the attachment points and limits of liability of the Policy.

204.     The issuance of declaratory relief will resolve this controversy.

205.     Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of CNA's obligations under the Policy.

206.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Non-Drowsy Actions and the Non-Drowsy Tenders.

## SECOND CAUSE OF ACTION
**Declaratory Judgment**
**Regarding CNA's Duty to Defend the Rapid Release Actions and Rapid Release Tenders**

207.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-206 of this Complaint as if fully set forth herein.

208.     The Policy constitutes a valid and enforceable contract in which LNK has a lawful interest.

209.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . . provided that. . . . such claim is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

210.     LNK is "Insured" under the Policy.

211.     Each of the Rapid Release Actions, and each of the related Rapid Release Tenders, constitutes a covered "**professional liability claim**" for "**damages**" arising out of a "**wrongful act**" that occurred on or after October 8, 2020, as those terms are defined in the Policy.

212.     Each of the Rapid Release Actions, and each of the related Rapid Release Tenders, is a claim that was made and reported to CNA before the termination of the Policy and/or before the end of the automatic ninety-day "**extended reporting period**."

213.     LNK gave CNA timely notice of each of the Rapid Release Actions and Rapid Release Tenders in accordance with the terms of the Policy.

214.     LNK has fully complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions, or prerequisites as a result of LNK's breaches and/or other conduct.

215.     No conditions, exclusions or provisions of the Policy completely bar coverage for the Rapid Release Actions or the Rapid Release Tenders. Thus, CNA is obligated to defend LNK or to provide coverage for LNK's defense costs, subject to the policy limits. CNA, however, has denied this obligation.

216.     LNK has sustained, and is continuing to sustain, a substantial amount of fees and expenses in defense of the Rapid Release Actions and Rapid Release Tenders.

217.     As a result, an actual and justiciable controversy exists between the parties regarding the existence and scope of CNA's obligations under the Policy to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Rapid Release Actions and Rapid Release Tenders, subject to the attachment points and limits of liability of the Policy.

218.     The issuance of declaratory relief will resolve this controversy.

219.     Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of CNA's obligations under the Policy.

220.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Rapid Release Actions and Rapid Release Tenders.

**THIRD CAUSE OF ACTION**
**Declaratory Judgment**
**Regarding CNA's Duty to Defend the APAP Actions and APAP Tenders**

221.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-220 of this Complaint as if fully set forth herein.

222.     The Policy constitutes a valid and enforceable contract in which LNK has a lawful interest.

223.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "**Insured**," "all amounts the **Insured** becomes legally liable to pay as **damages** as a result of . . . **bodily injury** . . . caused by an **occurrence** and arising out of a covered **products-work hazard claim** . . . provided that coverage applies to **claims** only if . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer," and "such **occurrence,** or such offense, first occurred on or after the retroactive date."

224.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . . provided that. . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

225.     LNK is "Insured" under the Policy.

226.     Each of the APAP Actions, and each of the related APAP Tenders, constitutes a covered "**products-work hazard claim**" for "**damages**" arising out of alleged "**bodily injury** . . . caused by an **occurrence**" that occurred on or after October 1, 1985, and/or constitutes a covered

"**professional liability claim**" for "**damages**" arising out of a "**wrongful act**" that occurred on or after October 8, 2020, as those terms are defined in the Policy.

227.    Each of the APAP Actions, and each of the related APAP Tenders, is a "**claim**" that was made and reported to CNA before the termination of the Policy and/or before the end of the automatic ninety-day "**extended reporting period**."

228.    LNK gave CNA timely notice of each of the APAP Actions and APAP Tenders, in accordance with the terms of the Policy.

229.    LNK has fully complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions, or prerequisites as a result of LNK's breaches and/or other conduct.

230.    No conditions, exclusions or provisions of the Policy completely bar coverage for the APAP Actions or the APAP Tenders. Thus, CNA is obligated to defend LNK or to provide coverage for LNK's defense costs, subject to the policy limits.  CNA, however, has failed to meet this obligation.

231.    LNK has sustained, and is continuing to sustain, a substantial amount of fees and expenses in defense of the APAP Actions and APAP Tenders.

232.    As a result, an actual and justiciable controversy exists between the parties regarding the existence and scope of CNA's obligations under the Policy to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the APAP Actions and APAP Tenders, subject to the attachment points and limits of liability of the Policy.

233.    The issuance of declaratory relief will resolve this controversy.

234.    Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of CNA's obligations under the Policy.

235.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the APAP Actions and the APAP Tenders.

## FOURTH CAUSE OF ACTION
### Breach of Contract With Respect to the Non-Drowsy Actions and Non-Drowsy Tenders

236.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-235 of this Complaint as if fully set forth herein.

237.     Pursuant to the terms of its Policy, CNA is obligated, consistent with the applicable limits and retention, to pay LNK's losses, including defense costs, incurred in connection with the Non-Drowsy Actions and/or the Non-Drowsy Tenders.

238.     LNK has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of CNA's breach and/or other conduct.

239.     The Non-Drowsy Actions and/or the Non-Drowsy Tenders constitute covered Claims under the terms of the Policy, and there are no applicable provisions that exclude coverage.

240.     CNA has breached its obligations under the Policy by refusing and/or failing to agree to pay such loss.

241.     Thus, LNK is entitled to coverage under the Policy for the full amount of its defense and indemnity costs LNK has or will incur arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders.

242.     As a result of CNA's breach of its obligations to cover LNK's defense and indemnity costs arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders, LNK has suffered and will continue to suffer damages in an amount to be determined in this action.

**FIFTH CAUSE OF ACTION**
**Breach of Contract With Respect to the Rapid Release Actions and Rapid Release Tenders**

243.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-242 of this Complaint as if fully set forth herein.

244.     Pursuant to the terms of its Policy, CNA is obligated, consistent with the applicable limits and retention, to pay LNK's losses, including defense costs, incurred in connection with the Rapid Release Actions and/or the Rapid Release Tenders.

245.     LNK has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of CNA's breach and/or other conduct.

246.     The Rapid Release Actions and/or the Rapid Release Tenders constitute a covered Claim under the terms of the Policy, and there are no applicable provisions that exclude coverage.

247.     CNA has breached its obligations under the Policy by refusing and/or failing to agree to pay such loss.

248.      Thus, LNK is entitled to coverage under the Policy for the full amount of its defense and indemnity costs LNK has or will incur arising out of the Rapid Release Actions and/or the Rapid Release Tenders.

249.     As a result of CNA's breach of its obligations to cover LNK's defense and indemnity costs arising out of the Rapid Release Actions and/or the Rapid Release Tenders, LNK has suffered and will continue to suffer damages in an amount to be determined in this action.

<u>**SIXTH CAUSE OF ACTION**</u>
**Breach of Contract With Respect to the APAP Actions and APAP Tenders**

250.    LNK repeats and re-alleges the allegations set forth in paragraphs 1-249 of this Complaint as if fully set forth herein.

251.    Pursuant to the terms of its Policy, CNA is obligated, consistent with the applicable limits and retention, to pay LNK's losses, including defense costs, incurred in connection with the APAP Actions and/or the APAP Tenders.

252.    LNK has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of CNA's breach and/or other conduct.

253.    The APAP Actions and/or the APAP Tenders constitute a covered Claim under the terms of the Policy, and there are no applicable provisions that exclude coverage.

254.    CNA has breached its obligations under the Policy by refusing and/or failing to agree to pay such loss.

255.     Thus, LNK is entitled to coverage under the Policy for the full amount of its defense and indemnity costs LNK has or will incur arising out of the APAP Actions and/or the APAP Tenders.

256.    As a result of CNA's breach of its obligations to cover LNK's defense and indemnity costs arising out of the APAP Actions and/or the APAP Tenders, LNK has suffered and will continue to suffer damages in an amount to be determined in this action.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Declaratory Judgment**
**Regarding CNA's Duty to Indemnify LNK for the**
**Non-Drowsy Actions and Non-Drowsy Tenders**

257.    LNK repeats and re-alleges the allegations set forth in paragraphs 1-256 of this Complaint as if fully set forth herein.

258.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . . provided that. . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

259.     LNK is "Insured" under the Policy.

260.     LNK has fully complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions, or prerequisites as a result of LNK's breaches and/or other conduct.

261.     No conditions, exclusions or provisions of the Policy completely bar coverage for the Non-Drowsy Actions or the Non-Drowsy Tenders.

262.     Thus, CNA is obligated to indemnify LNK for any judgment or settlement arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders, subject to the Policy limits. CNA, however, has failed to meet this obligation.

263.     As a result, an actual and justiciable controversy exists between the parties regarding the existence and scope of CNA's obligations under the Policy to indemnify LNK with respect to costs that LNK incurs arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders, subject to the attachment points and limits of liability of the Policy.

264.     The issuance of declaratory relief will resolve this controversy.

265.     Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of CNA's obligations under the Policy.

266.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Non-Drowsy Actions and/or the Non-Drowsy Tenders.

**EIGHTH CAUSE OF ACTION**
**Declaratory Judgment**
**Regarding CNA's Duty to Indemnify LNK for the**
**Rapid Release Actions and Rapid Release Tenders**

267.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-266 of this Complaint as if fully set forth herein.

268.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . . provided that. . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful act** first occurred on or after the retroactive date."

269.     LNK is "Insured" under the Policy.

270.     LNK has fully complied with all terms, conditions, and prerequisites to coverage set forth in the Policy, or has been excused from compliance with such terms, conditions, or prerequisites as a result of LNK's breaches and/or other conduct.

271.     No conditions, exclusions or provisions of the Policy completely bar coverage for the Rapid Release Actions or the Rapid Release Tenders.

272.     Thus, CNA is obligated to indemnify LNK for any judgment or settlement arising out of the Rapid Release Actions and the Rapid Release Tenders, subject to the Policy limits. CNA, however, has failed to meet this obligation.

273.     As a result, an actual and justiciable controversy exists between the parties regarding the existence and scope of CNA's obligations under the Policy to indemnify LNK with respect to costs that LNK incurs arising out of the Rapid Release Actions and the Rapid Release Tenders, subject to the attachment points and limits of liability of the Policy.

274.     The issuance of declaratory relief will resolve this controversy.

275.     Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of CNA's obligations under the Policy.

276.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to provide coverage for those defense costs that LNK incurs arising out of, the Rapid Release Actions and the Rapid Release Tenders.

### NINTH CAUSE OF ACTION
**Declaratory Judgment**
**Regarding CNA's Duty to Indemnify LNK for the APAP Actions and APAP Tenders**

277.     LNK repeats and re-alleges the allegations set forth in paragraphs 1-276 of this Complaint as if fully set forth herein.

278.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "**Insured**," "all amounts the **Insured** becomes legally liable to pay as **damages** as a result of . . . **bodily injury** . . . caused by an **occurrence** and arising out of a covered **products-work hazard claim** . . . provided that coverage applies to **claims** only if . . . such **claim** is both first made against the **Insured** during the **policy period**, or during the **extended reporting period**, if any, and reported to the Insurer," and "such **occurrence,** or such offense, first occurred on or after the retroactive date."

279.     Pursuant to the terms of the Policy, CNA is obligated to pay on behalf of each "Insured," "all amounts . . . that the **Insured** becomes legally liable to pay as **damages** as a result

of a covered **professional liability claim** by reason of a **wrongful act** by the **Insured**, . . . .

provided that. . . . such **claim** is both first made against the **Insured** during the **policy period**, or

during the **extended reporting** period, if any, and reported to the Insurer . . . [and] such **wrongful**

**act** first occurred on or after the retroactive date."

280.    LNK is "Insured" under the Policy.

281.    LNK has fully complied with all terms, conditions, and prerequisites to coverage

set forth in the Policy, or has been excused from compliance with such terms, conditions, or

prerequisites as a result of LNK's breaches and/or other conduct.

282.    No conditions, exclusions or provisions of the Policy completely bar coverage for

the APAP Actions or the APAP Tenders.

283.    Thus, CNA is obligated to indemnify LNK for any judgment or settlement arising

out of the APAP Actions and/or the APAP Tenders, subject to the Policy limits.  CNA, however,

has failed to meet this obligation.

284.    As a result, an actual and justiciable controversy exists between the parties

regarding the existence and scope of CNA's obligations under the Policy to indemnify LNK with

respect to costs that LNK incurs arising out of the APAP Actions and/or the APAP Tenders,

subject to the attachment points and limits of liability of the Policy.

285.    The issuance of declaratory relief will resolve this controversy.

286.    Pursuant to 28 U.S.C. § 2201, LNK is entitled to a declaration by this Court of

CNA's obligations under the Policy.

287.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in

favor of the LNK and against CNA, declaring that CNA is obligated to defend LNK in, or to

provide coverage for those defense costs that LNK incurs arising out of, the APAP Actions and/or the APAP Tenders.

## TENTH CAUSE OF ACTION
### Breach of the Implied Duty of Good Faith and Fair Dealing

288.    LNK repeats and re-alleges the allegations set forth in paragraphs 1-287 of this Complaint as if fully set forth herein.

289.    New York law imposes on CNA an implied covenant of good faith and fair dealing in the Policy.  This covenant operates to prevent any party from taking any action that would deprive the other of the benefits of the contract or to cause undue hardship or harm to the other party.  In insurance contracts, this covenant requires CNA to investigate in good faith and pay covered claims.

290.    CNA has unreasonably, recklessly, knowingly, intentionally, and maliciously denied or failed to provide coverage for the Non-Drowsy Claims, the Rapid Release Claims, and the APAP Claims, which are exactly the types of claims that the Policy is intended to cover.

291.    CNA's purported bases for denying or failing to provide coverage are such that no reasonable insurer would, under the given facts, be expected to assert lack of coverage on these grounds.

292.    By its actions, as set forth herein, CNA has breached the implied covenant of good faith and fair dealing in one or more of the following ways: (1) by unreasonably, recklessly, knowingly, intentionally, or maliciously delaying payment of the claim; (2) by arbitrarily, and with reckless disregard for the rights of LNK, refusing to effectuate prompt, fair, and equitable payment of the claim; and (3) by forcing LNK to sue for coverage when such coverage is patent.

293.    CNA's conduct has violated the standards of good faith and fair dealing set forth in New York Insurance Law § 2601(a) and evinces such bad faith that no reasonable insurer,

would, in these circumstances, be expected to engage in such conduct.  CNA, by its conduct, has exhibited a gross disregard for both CNA's Policy obligations and for the well-being of LNK, its Insured.

294.    As a result of CNA's breach of the implied covenant of good faith and fair dealing, LNK has incurred damages in an amount to be determined at trial.

295.    LNK is entitled to consequential damages flowing from CNA's violation of the implied covenant of good faith and fair dealing, including, without limitation, claim preparation expenses and attorneys' fees, costs, and disbursements incurred by LNK in enforcing their rights as a consequence of CNA's bad faith conduct.

296.    CNA's breach of the implied covenant of good faith and fair dealing has proximately caused and is proximately causing the consequential damages sustained by LNK.

297.    Consequential damages for breach of the implied covenant of good faith and fair dealing in the Policy were reasonably contemplated by LNK and CNA at the time they entered into the Policy.

******

## PRAYER FOR RELIEF

WHEREFORE, LNK prays for relief as follows:

a.    On the First Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring that LNK is entitled to defense costs under the Policy incurred by LNK arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders, subject to the attachment points and limits of the Policy;

b.    On the Second Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring that LNK is entitled to defense costs under the Policy incurred by LNK arising out of the Rapid Release Actions and/or the Rapid Release Tenders, subject to the attachment points and limits of the Policy;

c.    On the Third Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring that LNK is entitled to defense costs under the Policy incurred by LNK arising out of the APAP Actions and/or the APAP Tenders, subject to the attachment points and limits of the Policy;

d.    On the Fourth Cause of Action, for the Court to enter judgment against CNA with respect to the Non-Drowsy Actions and/or the Non-Drowsy Tenders and awarding CNA damages in an amount to be determined in this action;

e.    On the Fifth Cause of Action, for the Court to enter judgment against CNA with respect to the Rapid Release Actions and/or the Rapid Release Tenders and awarding CNA damages in an amount to be determined in this action;

f.    On the Sixth Cause of Action, for the Court to enter judgment against CNA with respect to the APAP Actions and/or the APAP Tenders and awarding CNA damages in an amount to be determined in this action;

g.    On the Seventh Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring that LNK is entitled to indemnification under the Policy for any damages or defense costs incurred by LNK arising out of the Non-Drowsy Actions and/or the Non-Drowsy Tenders, subject to the attachment points and limits of the Policy;

h.    On the Eighth Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring that LNK is entitled to indemnification under the Policy for any damages or defense costs incurred by LNK arising out of the Rapid Release Actions and/or the Rapid Release Tenders, subject to the attachment points and limits of the Policy;

i.    On the Ninth Cause of Action, for an order declaring the rights and obligations of the parties under the Policy with respect of the matters set forth herein and further declaring

that LNK is entitled to indemnification under the Policy for any damages or defense costs incurred by LNK arising out of the APAP Actions and/or the APAP Tenders, subject to the attachment points and limits of the Policy;

j.      On the Tenth Cause of Action, for the Court to enter judgment against CNA and awarding LNK consequential money damages in an amount to be determined at trial;

k.      On all Causes of Action, awarding all costs incurred as a consequence of having to prosecute this lawsuit, including prejudgment and post-judgment interest and attorneys' fees; and

l.      On all Causes of Action, awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

LNK hereby demands a trial by jury on all issues so triable.

Dated: August 30, 2022
       New York, New York

                              **COHEN ZIFFER FRENCHMAN**
                              **& MCKENNA, LLP**

                    By:     */s/ Kenneth H. Frenchman*
                              Kenneth H. Frenchman
                              Chelsea L. Ireland
                              1325 Avenue of the Americas
                              New York, New York 10019
                              P: (212) 584-1890
                              F: (212) 584-1891
                              kfrenchman@cohenziffer.com
                              cireland@cohenziffer.com

                              *Attorneys for Plaintiff L.N.K. International, Inc.*

**APPENDIX A**

**Existing Non-Drowsy Actions**

*Been v. CVS Health Corp., et al.*, Case No. 22SL-CC03550 (Mo. Cir. Ct., St. Louis County)

*Goldstein v. Walmart Inc.*, Case No. 1:22-cv-00088-LJL (S.D.N.Y)

*Hall v. Walgreens Boot Alliance, Inc., et al.*, Case 1:22-cv-00024 (N.D. Ill)

*Gibson v. Albertsons Companies, Inc.*, Case No. 1:22-cv-00642 (N.D. Ill.)

*Harris, et al. v. Supervalu, Inc.*, 1:22-cv-02863 (N.D. Ill.)

*Moore v. Meijer, Inc.*, Case No. 2:22-cv-10417-GCS-CI (E.D. Mich.)

*Larusso v. CVS Health Corp.*, Case No 7:21-cv-10849-PMH (S.D.N.Y.)

*Lemus v. Rite Aid Corp.*, Case No. 8:22-cv-00253 (C.D. Cal.)

**Existing Rapid Release Actions**

*Bischoff v. Albertsons Companies, Inc., et al.*, Case No. 7:22-cv-04961 (S.D.N.Y.)

*Morgan v. Albertsons Companies, Inc., et al.*, Case No. 4:22-cv-02948 (N.D. Cal.)

*Sapienza v. Albertsons Companies, Inc., et al.*, Case No. 1:22-cv-10968 (D. Mass.)

**Existing APAP Actions**

*Baxter, et al. v. Walmart, Inc.*, Case No. 0:22-cv-01661-WMW-BRT (D. Minn.)

*Brewer, et al. v. Wal-Mart Stores, Inc.*, Case No. 2:22-cv-01012-RFB-BNW (D. Nev.)

*Chapman, et al. v. Walmart Inc.*, Case No. 2:22-cv-00919-JAD-VCF (D. Nev.)

*Foley, et al. v. Wal-Mart Stores, Inc.*, Case No. 3:22-cv-05040 (W.D. Mo.)

*Gaddis, et al. v. Wal-Mart Stores, Inc.*, Case No. 4:22-cv-00367-SRB (W.D. Mo.)

*Hatfield, et al. v. Wal-Mart Stores, Inc.,* Case No. 5:22-cv-05109-TLB (W.D. Ark.)

*Maguire, et al. v. Wal-Mart Stores, Inc.*, Case No. 4:22-cv-03238-DMR (N.D. Cal.)

*Nickles, et al. v. Wal-Mart Stores, Inc.*, Case No. 4:22-cv-00368-FJG (W.D. Mo.)

*Oleson, et al. v. Wal-Mart Stores, Inc.,* Case No. 2:22-cv-01026-RFB-DJA (D. Nev.)

*Roberts, et al. v. Wal-Mart Stores, Inc.,* Case No. 5:22-cv-05108-TLB (W.D. Ark.)

*Rutledge, et al. v. Wal-Mart Stores, Inc.*, Case No. 2:22-cv-00777-TL (W.D. Wash.)

*Thompson, et al. v. Walmart Inc.*, Case No. 3:22-cv-03408-JCS (N.D. Cal.)

*Precious Watts, et al. v. Walmart, Inc.,* Case No. 0:22-cv-01675-KMM-DTS (D. Minn.)

*Monique Bell, et al. v. Walgreens Boots Alliance, et al.*, Case No. 3:22-cv-03882-LB (N.D. Cal.)

*Linzy Funk, et al. v. Walmart, Incorporated,* Case No. 22-cv-01809-E9T-ECW (D. Minn.)